**OLIVE FARAPO, TEKURA ALU, and LILLY PAUMBARI,**
**Plaintiffs**

**v.**

**SU`A SCHUSTER, STARR SCHUSTER, and GLEN SCHUSTER,**
**Defendants**

High Court of American Samoa
Trial Division

CA No. 97-92

July 21, 1994

Before KRUSE, Chief Justice, TAUANU`U, Associate Judge, and LOGOAI, Associate Judge.

Counsel:      For Plaintiffs, Charles V. Ala`ilima
              For Defendants, Gata Edwin Gurr

Decision and Order:

The plaintiffs, nationals of Papua New Guinea, initially met the defendants Su`a and Starr Schuster in September 1991, while the latter were attending the South Pacific Games in Port Moresby, Papua New Guinea. At the

time, plaintiffs were working as domestics at the hotel where the Schusters were staying. The evidence[1] conflicts as to who first approached whom; but in the course of their contacts, plaintiffs and the Schusters befriended each another, and their encounters eventually led to the idea of plaintiffs' returning with the Schusters to American Samoa. The Schusters then somehow managed to hastily arrange entry permits for the plaintiffs, who accompanied the Schusters on their return to American Samoa, with the rest of the territory's South Pacific Games contingent.

The only clear understanding among the parties that may be gathered from the evidence was that plaintiffs would live with the Schusters who would be responsible for their care; that plaintiffs would be expected to do household chores; that the arrangement would be for a period of one year, to see how things worked out; and that the Schusters would from time to time provide plaintiffs with money for personal use.

Upon arrival, the Schusters immediately had to depart the territory again for a family *fa`alavelave* on the mainland. Mrs. Schuster arranged with relatives to house-sit with plaintiffs until the Schusters' return. It seems, however, that plaintiffs soon became very homesick; they were on the telephone almost daily to Papua New Guinea. The Schusters were later startled to discover that their telephone bill for the months of November and December 1991 included nearly $4,000 in telephone calls to Papua New Guinea.

Plaintiffs' duties were initially confined to chores around the family home; however, these duties left plaintiffs with a lot of spare time on their hands. So, they were subsequently instructed by Mrs. Schuster to help out with the family video-rental shop, which was being operated by her daughter, and a lunch wagon, which was being run by her son, defendant Glen Schuster. Work at the video shop and lunch wagon was periodic. This was brought about in part by the Schuster children's need for assistance, in part by their need for baby-care help, and in part by the plaintiffs' desire, which was expressed to Mrs. Schuster, to get out of the house. Plaintiffs became increasingly disenchanted with their Samoan sojourn and they soon wanted to be returned home. Mrs. Schuster, on the other hand, told plaintiffs to arrange for their own passage if they wanted to return home early. Relations soured, and plaintiffs, eventually defiant, left the

---

[1] The evidence here included transcripts of depositions of plaintiffs, moved onto the record without objection from the defendants, who had already left the territory by the time of trial.

Schuster household and filed suit seeking compensation and punitive damages. The Schusters responded by withdrawing their immigration sponsorship, which in turn gave rise to deportation proceedings and the issuance of a deportation order by the immigration authorities. Plaintiffs successfully appealed the deportation order. *See Farapo v. American Samoa Government*, 23 A.S.R.2d 136 (App. Div. 1993). However, they subsequently decided to depart the territory, which they did at the expense of the Schusters, who as sponsors were ultimately responsible for plaintiffs' return passage.[2]

Plaintiffs' claim to compensation are based on the contention that the parties had concluded an employment contract. Alternatively, plaintiffs pose a "quasi" employment contract with the Schusters, as "may be imposed under terms the court finds appropriate to secure just restitution to the aggrieved parties for services performed." Plaintiffs' Closing Arguments and Memorandum, at 6.

The evidence does not, in our view, bear out plaintiffs' contract claims. While initially attempting to analyze the evidence in terms of "offer" and "acceptance," plaintiffs readily concede that "the express contract analysis might be . . . stretch[ing] credulity a bit." Plaintiffs' Closing Arguments and Memorandum, at 7. As to an implied contract, we note that plaintiffs' evidence with regard to the issue of employment with the Schusters is not consistent. While Lilly Paumbari, who was introduced to the Schusters by Olive Farapo, deposed that she was recruited by the Schusters for hire, Olive Farapo's and Tekura Alu's depositions tend to support the Schusters' position that their discussions with plaintiffs contemplated a familial-like setup; that is, plaintiffs would live within the Schusters' household, and the latter would care for them as family members. At the same time, the evidence also suggests that plaintiffs' real motivation to leave home and travel to American Samoa was more the result of an impulsive sense of adventure, that unfortunately did not pan out as imagined, rather than prospective employment with the Schusters. Olive Farapo, for example, was keen "to see the country place" and find similar work with a hotel in American Samoa; she responded on cross-examination that Mrs. Schuster did not offer employment nor was Mrs. Schuster made aware of her expectations for hotel-type work in American Samoa. As noted above, plaintiffs very early developed a severe case of homesickness, and their desire to return home much sooner than expected bears out the impulsive nature of their decision to venture away from home in the first place.

---

See A.S.C.A. § 41.0408(e).

Thus, plaintiffs' contention that an employment contract may be "implied" is likewise without foundation. The evidence simply fails to sustain the desired inference.

■ Absent a contract-in-fact, plaintiffs alternatively argue a "quasi-contract" theory of liability. Unlike the situation with contracts-in-fact, express or implied, in which liability is based on the apparent intentions of the parties, liability under a quasi-contract theory is implied-in-law by the equitable principle against unjust enrichment. *See Schott v. Westinghouse Electric Corporation*, 259 A.2d 443 (Pa. 1969). That is:

> [i]n quasi-contracts the obligation arises, not from consent of the parties as in the case of contracts expressed or implied in fact, but from the law of natural immutable justice and equity. Where a case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfill that obligation. The duty, which forms the foundation of a quasi-contractual obligation, is frequently based on the doctrine of unjust enrichment.

66 Am. Jur. 2d, *Restitution and Implied Contracts*, § 2, at 943-944 (1973 & Supp. 1993). Thus, plaintiffs are here seeking restitution for services rendered on the claim that the Schusters were unjustly enriched by the value of those services. Nevertheless, this unjust enrichment claim is also unsupported by the evidence.

■ When an individual lives as a member of a family's household, a presumption arises that the services for which compensation is sought were rendered gratuitously. This is true even when persons living in the same household are not related by blood or affinity. *Peoples Nat'l Bank v. Cohn*, 110 S.W.2d 42, 45 (Ark. 1937) (stating that, conversely, even close relatives may receive compensation for services if such an agreement actually existed); *Wells v. Goff*, 239 S.W.2d 301, 303-04 (Mo. 1951) ("Kinship in any degree . . . are [sic] not necessarily essential to the establishment of a family relation," which precludes compensation in the absence of an express or implied contract.). When a claimant has provided housekeeping services, courts have considered a claimant's dependence on the services' recipient for support in raising the presumption that the services were rendered gratuitously. Courts have also considered factors such as the legal or moral obligation of a service's recipient to support a claimant and the loyalty, mutual respect, and devotion existing between the parties. Annotation, *Establishment of "Family" Relationship to Raise Presumption that Services Were Rendered*

*Gratuitously, as Between Persons Living in Same Household but not Related by Blood or Affinity*, 92 A.L.R.3d 726, 731, 745, 754 (1979 & Supp. 1991). *See, e.g., Smith v. Riedele*, 213 P. 281 (Cal. App. 1923) (no implied payment contract was found when claimant lived and ate his meals in respondent's household, never paid for room or board, and occasionally received gifts of clothing and money); *Manning v. Driscoll's Estate*, 174 S.W.2d 921, 924 (Mo. App. 1943) (a family relationship existed when a woman did household work, a man provided rent money and paid expenses, both persons invited friends and relatives to visit and have meals, and neither kept records of services rendered or expenses paid); *Arns v. Disser*, 178 N.E. 27, 28 (Ohio App. 1931) (a man who lived in a family and did household work was not entitled to compensation, as a court will not imply an obligation to pay for services performed by a family member).

█ In short, restitutionary claims under the quasi-contract theory do not apply to family situations. What the evidence here discloses is essentially a familial setup--the widespread practice of extending a Samoan household beyond its immediate family members. Thus, a claim of unjust enrichment is inconsistent with this context. Plaintiffs resided in the Schusters' household and did not pay for room or board. While living there, plaintiffs performed household chores and worked in family businesses. Additionally, plaintiffs occasionally received money for personal use.

On their claim for punitive damages, plaintiffs essentially argue that there is a need to deter exploitation of people like the plaintiffs by those of "influence," such as the Schusters, who are able to "abuse both the territory's immigration process and . . . wage and hour laws." Plaintiffs' Closing Arguments and Memorandum, at 12. We see no basis in fact for this claim and similarly deny the same.

In conclusion, the evidence presented failed to show the existence of an employment contract. Furthermore, plaintiffs are not entitled to compensation on a quasi-contract theory, having failed to present evidence sufficient to overcome the presumption of gratuitous service by family members. Similarly, plaintiffs' punitive-damage claim is baseless. Therefore, this court's decision is rendered in favor of the defendants. Judgment shall enter accordingly.

It is so ordered.